FILED
2023 Sep-27  PM 01:34
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **MEGIN LANIER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No.: 3:22-cv-00650-AMM** |
| | ) | |
| **SOCIAL SECURITY** | ) | |
| **ADMINISTRATION,** | ) | |
| **Commissioner,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OF DECISION

Plaintiff Megin Lanier brings this action pursuant to the Social Security Act (the "Act"), seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for a period of disability and disability insurance benefits ("benefits"). *See* 42 U.S.C. § 405(g). Based on the court's review of the record, the court **AFFIRMS** the decision of the Commissioner.

## I.    Introduction

On February 25, 2020, Ms. Lanier protectively filed an application for benefits under Title II of the Act, alleging disability as of April 1, 2013. R. 10, 74–80, 167–71. Ms. Lanier later amended her alleged onset date of disability to October 8, 2015. R. 10, 46. Ms. Lanier alleges disability due to depression, anxiety, scoliosis,

and high blood pressure. R. 74. She has a limited education and past relevant work experience as a convenience store clerk. R. 22.

The Social Security Administration ("SSA") initially denied Ms. Lanier's application on July 9, 2020, and again upon reconsideration on August 5, 2020. R. 10, 74–80, 82–88. On March 29, 2021, Ms. Lanier filed a request for a hearing before an Administrative Law Judge ("ALJ"). R. 10, 113–14. That request was granted. R. 133–37. Ms. Lanier received a telephone hearing before ALJ Lori J. Williams on September 30, 2021. R. 10, 34–73. On December 15, 2021, ALJ Williams issued a decision, finding that Ms. Lanier was not disabled from October 8, 2015 through her date of last insured, June 30, 2019. R. 10–24. Ms. Lanier was thirty-seven years old at the time of the ALJ decision. R. 22, 24.

Ms. Lanier appealed to the Appeals Council, which denied her request for review on March 30, 2022. R. 1–3. After the Appeals Council denied Ms. Lanier's request for review, R. 1–3, the ALJ's decision became the final decision of the Commissioner and subject to district court review. On May 20, 2022, Ms. Lanier sought this court's review of the ALJ's decision. *See* Doc. 1.

## II.   The ALJ's Decision

The Act establishes a five-step test for the ALJ to determine disability. 20 C.F.R. § 404.1520. *First*, the ALJ must determine whether the claimant is engaging in substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). "Substantial work

activity is work activity that involves doing significant physical or mental activities." 20 C.F.R. § 404.1572(a). "Gainful work activity" is work that is done for pay or profit. 20 C.F.R. § 404.1572(b). If the ALJ finds that the claimant engages in substantial gainful activity, then the claimant cannot claim disability. 20 C.F.R. § 404.1520(b). *Second*, the ALJ must determine whether the claimant has a medically determinable impairment or a combination of medical impairments that significantly limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(a)(4)(ii), (c). Absent such impairment, the claimant may not claim disability. *Id*. *Third*, the ALJ must determine whether the claimant's impairment meets or medically equals the criteria of an impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1. *See* 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526. If such criteria are met, the claimant is declared disabled. 20 C.F.R. § 404.1520(a)(4)(iii).

If the claimant does not fulfill the requirements necessary to be declared disabled under the third step, the ALJ still may find disability under the next two steps of the analysis. The ALJ must first determine the claimant's residual functional capacity, which refers to the claimant's ability to work despite her impairments. 20 C.F.R. §§ 404.1520(e), 404.1545. In the *fourth* step, the ALJ determines whether the claimant has the residual functional capacity to perform past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). If the ALJ determines that the claimant is capable of performing past relevant work, then the claimant is deemed not disabled. *Id*. If the

ALJ finds the claimant unable to perform past relevant work, then the analysis proceeds to the *fifth* and final step. 20 C.F.R. § 404.1520(a)(4)(v). In this step, the ALJ must determine whether the claimant is able to perform any other work commensurate with her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(g)(1). Here, the burden of proof shifts from the claimant to the Commissioner to prove the existence, in significant numbers, of jobs in the national economy that the claimant can do given her residual functional capacity, age, education, and work experience. 20 C.F.R. §§ 404.1520(g)(1), 404.1560(c).

The ALJ determined that Ms. Lanier would meet the insured status requirements of the Act through June 30, 2019. R. 11–12. Next, the ALJ found that Ms. Lanier "did not engage in substantial gainful activity during the period from her amended alleged onset date of October 8, 2015 through her date last insured of June 30, 2019." R. 12. The ALJ decided that Ms. Lanier had the following severe impairments: hypertension; obesity; a major depressive disorder versus a bipolar disorder with depression; and an anxiety disorder. R. 12. The ALJ found that Ms. Lanier's scoliosis of the thoracic spine was not a severe impairment because "[t]here is no objective evidence . . . of scoliosis that is severe enough to cause significant limitations to [Ms. Lanier's] ability to perform work-related activities." R. 13. The ALJ found that Ms. Lanier's asthma was not a severe impairment because "[t]here

is no evidence . . . of more than minimal limitations to [Ms. Lanier's] ability to perform work-related activities or that her breathing impairment from asthma has been present for twelve consecutive months during the relevant period." R. 13. Overall, the ALJ determined that Ms. Lanier "did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments" to support a finding of disability. R. 13.

The ALJ found that Ms. Lanier's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 18. The ALJ found that Ms. Lanier "had the residual functional capacity to perform medium work" with certain limitations. R. 16. The ALJ determined that Ms. Lanier could: occasionally lift and/or carry up to fifty pounds; frequently lift and/or carry up to twenty-five pounds; stand and/or walk in combination with normal breaks for six to eight hours in an eight-hour workday; sit with normal breaks for six to eight hours in an eight-hour workday; frequently climb ramps and stairs; occasionally climb ladders, ropes, or scaffolds; frequently balance, stoop, kneel, crouch, and crawl; and occasionally be exposed to extreme heat, humidity, and working in areas of vibration. R. 16–17. The ALJ prohibited: exposure to industrial hazards, including working at unprotected heights; working in close proximity to moving dangerous machinery; and operating motorized vehicles and equipment. R. 17. The ALJ determine that Ms.

Lanier could: perform simple, routine tasks requiring no more than simple one- to three-step instructions and simple, work-related decision making; tolerate occasional interactions with co-workers and supervisors but no interactions with members of the general public; and adapt and respond appropriately to infrequent, well-explained changes in the workplace. R. 17.

The ALJ determined that Ms. Lanier's past relevant work was that of a convenience store clerk. R. 22. The ALJ determined Ms. Lanier is "unable to perform any past relevant work." R. 22.

According to the ALJ, Ms. Lanier is "a younger individual" and has "a limited education," as those terms are defined by the regulations. R. 22. The ALJ determined that "[t]ransferability of job skills is not an issue in this case because [Ms. Lanier's] past relevant work is unskilled." R. 22. Because Ms. Lanier's "ability to perform all or substantially all of the requirements of [medium] work was impeded by additional limitations," the ALJ enlisted a vocational expert to ascertain whether there were a significant number of jobs in the national economy that Ms. Lanier was capable of performing. R. 22–23. That expert concluded that there were indeed a significant number of such jobs in the national economy, such as an automotive cleaner II, bundle clerk, and factory worker. R. 23.

Based on these findings, the ALJ concluded that Ms. Lanier was not under a disability as defined in the Act, from October 8, 2015, through June 30, 2019, the date of last insured. R. 23–24. Ms. Lanier now challenges that decision.

## III. Factual Record

The medical records included in the transcript begin before the alleged onset date and extend beyond the date of last insured. However, the period relevant to the Commissioner's disability determination is October 8, 2015 through June 30, 2019. R. 23. Additionally, to the extent the medical records relate to medical conditions and symptoms that are not relevant to Ms. Lanier's arguments before the court, they are not discussed.

Ms. Lanier presented to Singing River Healthcare on October 8, 2015 to be treated for anxiety. R. 344. Ms. Lanier reported anxiety symptoms of: "panic attacks; nervousness; worries; hyperventilating; vomits; chest pain." R. 344. Ms. Lanier reported that she tried Paxil, Prozac, and other medications in the past, and has been on clonazepam since she was a teenager. R. 344. Ms. Lanier reported that clonazepam helps, but other medications made her worse. R. 344. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 345. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Mood and affect appropriate." R. 345. Ms. Lanier was prescribed clonazepam for

anxiety and advised to return to the clinic in two weeks for an unrelated urine re-check. R. 346. At that re-check, Ms. Lanier's psychiatric exam revealed she was: "Alert and oriented x3. Mood and affect appropriate." R. 348.

Ms. Lanier presented to Singing River Healthcare on December 31, 2015 to be treated for anxiety and back pain. R. 349. Ms. Lanier reported having "nervousness; worries; panic attacks; weight loss." R. 349. She stated that she had been taking her anxiety medication and had "a lot of 'stuff' going on right now with her personally." R. 349. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 350. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Mood and affect appropriate." R. 350. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in two months. R. 350–51.

Ms. Lanier presented to Singing River Healthcare on March 1, 2016 to be treated for anxiety and back pain. R. 352. Ms. Lanier reported having "nervousness [and] panic attacks." R. 352. She stated that her anxiety was "[c]ontrolled and managed with medication." R. 352. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 353. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Mood and affect appropriate."

R. 353. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in three months. R. 353–54. At a March 30, 2016 appointment for ear and sinus congestion, Ms. Lanier's mood and affect were appropriate. R. 356.

Ms. Lanier presented to Singing River Healthcare on June 1, 2016 to be treated for anxiety and back pain. R. 357. Ms. Lanier reported having "nervousness [and] panic attacks." R. 349. She stated that her anxiety was "[c]ontrolled with medication." R. 357. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 358. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Mood and affect appropriate." R. 358. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in three months. R. 358–59.

Ms. Lanier presented to Singing River Healthcare on August 2, 2016 to be treated for anxiety, back pain, and acne. R. 360. Ms. Lanier reported having "nervousness [and] panic attacks." R. 360. She stated that her anxiety was "usually controlled with medication, but thinks she needs to increase it some." R. 360. Ms. Lanier had "already been taking more [medication] on her own." R. 360. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 362. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and

oriented x3. Affect appropriate. Anxious; fidgeting; wringing hands[.]" R. 362. Ms. Lanier was advised to return to the clinic for her follow-up as scheduled and "to call prior to running out of medication." R. 362.

Ms. Lanier presented to Singing River Healthcare on February 15, 2017 to be treated for anxiety and back pain. R. 363. Ms. Lanier reported she was "nervous, anxious[,] and [had] panic attacks." R. 363. She stated that her anxiety was "usually controlled with medication, but she ran out 3–4 weeks ago because she didn't have ins[urance]." R. 363. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 364. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Affect appropriate. Anxious; fidgeting; wringing hands[.]" R. 364. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in three months. R. 365.

Ms. Lanier presented to Singing River Healthcare on May 10, 2017 to be treated for anxiety and back pain. R. 366. Ms. Lanier reported as symptoms: "panic attacks, anxious[,] and nerves bother her a lot." R. 366. She stated that her "medication usually helps with this." R. 366. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 367. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Affect

appropriate. Anxious; fidgeting; wringing hands[.]" R. 367. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in three months. R. 368.

Ms. Lanier presented to Singing River Healthcare on August 31, 2017 to be treated for anxiety and back pain. R. 369. Ms. Lanier reported symptoms: "anxious and nervous, also has panic attacks sometimes." R. 369. She stated that her anxiety was "usually controlled with medication." R. 369. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 370. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Affect appropriate. Anxious; fidgeting; wringing hands[.]" R. 370. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in three months. R. 369, 371.

Ms. Lanier presented to Singing River Healthcare on November 28, 2017 to be treated for anxiety and back pain. R. 281. Ms. Lanier reported being "anxious, nerves bother her a long, under a lot of stress[,] and [experiencing] panic attacks sometimes." R. 281. She stated that she had experienced anxiety for fifteen to sixteen years, and that her "medication usually helps." R. 281. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 283. The

physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Affect appropriate. Anxious; fidgeting; wringing hands[.]" R. 285. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in six months. R. 285.

Ms. Lanier presented to Singing River Healthcare on May 22, 2018 to be treated for anxiety and back pain. R. 287. Ms. Lanier reported being "anxious and nervous most of the time" with stress and occasional panic attacks. R. 287. She stated that she had experienced anxiety for sixteen years, and that her "medication helps a lot." R. 287. The physical exam notes that Ms. Lanier "has been under a lot of personal stress." R. 289. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 289. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Affect appropriate. Intermittent eye contact[.]" R. 289. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in six months. R. 291.

Ms. Lanier presented to Singing River Healthcare on November 13, 2018 to be treated for anxiety and back pain. R. 293. Ms. Lanier reported being "nervous, anxious[, and experiencing] panic attacks." R. 293. She stated that she had experienced anxiety for sixteen years, and that her "medication helps a lot." R. 293. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented.

Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 295. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Affect appropriate. Intermittent eye contact[.]" R. 295. Ms. Lanier was prescribed clonazepam for anxiety and advised to return to the clinic in six months. R. 297.

Ms. Lanier next presented to Singing River Healthcare on October 2, 2019, after her date of last insured, to be treated for anxiety, chronic pain, and high blood pressure. R. 299. Ms. Lanier reported that she "stays anxious and nervous most of the time," experiences occasional panic attacks, and "worries constantly." R. 299. Ms. Lanier reported that when she experiences a panic attack she has shortness of breath, becomes nauseated, and has crying spells. R. 299. Ms. Lanier reported that her anxiety "recently worsened in the last few months." R. 299. Ms. Lanier also reported that she had seen psychiatrists for mental health issues and taken antidepressants in the past, "but always stopped taking them because of side effects." R. 299. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 303. The physical psychiatric exam revealed that Ms. Lanier was: "Anxious; Depressed; Rambling Speech; Alert and Oriented x3." R. 303. Ms. Lanier was prescribed Zoloft, referred for a psychiatrist evaluation, and advised to return to the clinic in four weeks. R. 303.

Ms. Lanier returned for her follow-up appointment on October 30, 2019. R. 305. Ms. Lanier reported that her anxiety symptoms were improved with Zoloft and that she was awaiting an appointment with a psychiatrist.  R. 305. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 309. Ms. Lanier was prescribed Zoloft, referred to a psychiatrist, and advised to follow up in three months. R. 309.

Ms. Lanier presented to Singing River Healthcare on January 30, 2020 to be treated for anxiety/depression, hypertension, cough, and ear pain. R. 372. Ms. Lanier was "[t]earful, anxious, [and] jittery[,]" and reported that "her anxiety and depression have increased due to personal issues at home." R. 372. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 374. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Anxious and crying." R. 374. Ms. Lanier was prescribed Zoloft and advised to return to the clinic in four weeks. R. 374.

Ms. Lanier presented to Singing River Healthcare on March 4, 2020 to be treated for anxiety/depression, hypertension, and chronic low back pain. R. 375. Ms. Lanier reported that her "symptoms have not improved much since increasing Zoloft," "she feels depressed all the time," and she "barely leaves her home now."

14

R. 375. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 377. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Flat affect." R. 377. Ms. Lanier was advised to continue medication and referred to integrated behavioral health. R. 377.

Ms. Lanier presented to Singing River Healthcare on April 7, 2020 to be treated for abdominal pain, bipolar depression/anxiety, and hypertension. R. 378. Ms. Lanier reported "[f]requent anxiety and mood swings[.]" R. 378. She stated that she had an appointment with integrated behavioral health. R. 378. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 380. The physical psychiatric exam revealed that Ms. Lanier was: "Alert and oriented x3. Anxious and tearful." R. 380.

Ms. Lanier presented to Singing River Healthcare on October 2, 2020 to be treated for bipolar depression, hypertension, and chronic low back pain. R. 382. Ms. Lanier reported symptoms of "depression, anxiety, [and] mood swings." R. 382. She stated that her bipolar depression was "[m]anaged with meds at Riverbend." R. 382. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 384. The physical psychiatric exam revealed that Ms. Lanier was:

"Alert and oriented x3. Flat affect." R. 384. Ms. Lanier was advised to follow up in six months. R. 384.

Ms. Lanier presented to Singing River Healthcare on April 16, 2021 to be treated for anxiety, bipolar depression, hypertension, and chronic back pain. R. 386. The physical neurologic exam revealed that Ms. Lanier was: "Alert and oriented. Speech is clear and understandable. Grossly intact with no focal abnormalities identified." R. 387. PA Dorothy Hicks advised Ms. Lanier to follow up in one month and stated that she planned to "start tapering [clonazepam] back at [the] next office visit." R. 388. Ms. Lanier presented for her follow-up appointment on May 14, 2021, and she was "very tearful" and stated she "would like to get off the pain medication as it makes her feel awful" and she was "trying to get on disability, once again, for a back issue." R. 389. Ms. Lanier continued to be treated for chronic low back pain by Singing River Healthcare throughout 2021. R. 392, 395.

After the date of last insured, Ms. Lanier was treated for major depressive disorder and generalized anxiety disorder at Riverbend Center for Mental Health. *See, e.g.*, R. 319, 400–24, 495–98. Ms. Lanier's depression, anxiety, and panic disorder were all described as "severe." R. 320 (June 11, 2020). Beginning August 31, 2020 and continuing through November 22, 2021, records reflect that Ms. Lanier was prescribed QUEtiapine, Propranolol HCI, Zoloft, busPIRone, Wellbutrin SR, and SEROquel by Riverbend Center for Mental Health. R. 400, 496.

IV.    **Standard of Review**

This court's role in reviewing claims brought under the Act is a narrow one. The only issues before this court are whether the record reveals substantial evidence to sustain the Appeal Council's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied, *see Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The Act mandates that the Commissioner's findings are conclusive if supported by "substantial evidence." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990); *see* 42 U.S.C. § 405(g). This court may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the record as a whole and determine if the decision is reasonable and supported by substantial evidence. *See Martin*, 894 F.2d at 1529 (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983)).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239). If the Commissioner's factual findings are supported by substantial evidence, they must be affirmed even if the preponderance of the evidence is against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. No

17

decision is automatic, for "[d]espite th[e] deferential standard [for review of claims], it is imperative that th[is] Court scrutinize the record in its entirety to determine the reasonableness of the decision reached." *Bridges v. Bowen*, 815 F.2d 622, 624 (11th Cir. 1987) (citing *Arnold v. Heckler*, 732 F.2d 881, 883 (11th Cir. 1984)). Failure to apply the correct legal standards is grounds for reversal. *See Bowen v. Heckler*, 748 F.2d 629, 635 (11th Cir. 1984).

## V.    Discussion

Ms. Lanier argues that "1. The ALJ failed to properly evaluate the medical opinion evidence; 2. The ALJ failed to properly evaluate Ms. Lanier's subjective statements; 3. The ALJ failed to properly determine Ms. Lanier's functional capacity; and, 4. The ALJ relied on a flawed hypothetical question to the vocational expert." Doc. 10 at 2–3.

### A. The ALJ's Evaluation of Ms. Lanier's Medical Opinion Evidence

The SSA has revised the applicable regulations related to medical opinion evidence. The SSA's new regulations, promulgated in 2017, do away with the hierarchy of medical opinions and the treating source rule. 20 C.F.R. § 404.1520c(a). Under the new regulations, an ALJ need not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" for all claims filed on or after March 27, 2017. *Id*. And the ALJ "will articulate in [her] determination

or decision how persuasive [she] find[s] all of the medical opinions . . . in [the claimant's] case record." *Id.* § 404.1520c(b).

When evaluating the persuasiveness of the opinions, the ALJ considers these factors: (1) supportability, i.e., how "relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s)"; (2) consistency with the evidence; (3) relationship with the claimant, including the nature of the relationship, the length of the treatment relationship, the frequency of examinations, and the extent of the treatment relationship; (4) specialization; and (5) "[o]ther factors," such as the medical source's familiarity with the agency's policies and the evidence in the claim. *Id.* § 404.1520c(c). It is not improper for an ALJ to consider a claimant's daily activities when evaluating a medical opinion. *See id.* § 404.1520c(c)(5) (stating that an ALJ may consider any other relevant factors "that tend to support or contradict a medical opinion"). Supportability and consistency are the most important of the five factors, and an ALJ must "explain how [she] considered the supportability and consistency factors for a medical source's medical opinions . . . in [her] . . . decision." *Id.* § 404.1520c(b)(2). The ALJ may explain how she considered the remaining factors, but she is not required to do so. *Id.*

Ms. Lanier argues that the ALJ failed to accord proper weight to a November 1, 2021 letter, Clinical Assessment of Pain, and Medical Questionnaire Regarding Limitations by PA-C Dorothy Hicks. Doc. 10 at 4–8; *see also* R. 500–03.

In her letter, PA-C Hicks wrote:

> Megin Lanier was seen today for a clinical assessment for disability. From a physical standpoint, she does have a history of chronic back pain which would likely hinder her from full time employment. It is this provider[']s feelings that her mental health conditions along with her psychiatric medications would greatly impair her ability to sustain employment. She has profound anxiety that would limit her ability to respond to customary work pressures and her chronic fatigue from medication side effects would likely cause her to miss many days of work. She is unable [to] focus or concentrate for a 30 minute doctor's appointment leading this provider to believe she would fail tasks required for employment.

R. 500.

In the Clinical Assessment of Pain, PA-C Hicks opined that "Drug side effects can be expected to be severe and to limit effectiveness due to distraction, inattention, drowsiness, etc." R. 501.

In the Medical Questionnaire Regarding Limitations, PA-C Hicks opined that Ms. Lanier's "medical conditions preclude her ability to maintain concentration, persistence[,] and pace for two-hour periods" and "to perform activities within a schedule, maintain regular attendance[,] and be punctual within customary tolerances on a continuous basis." R. 502. PA-C Hicks also opined that "[d]ue to

extreme fatigue secondary to psychiatric medications," Ms. Lanier was required to lie down during the day. R. 502. PA-C Hicks wrote that Ms. Lanier could sit eight hours and stand/walk eight hours during an eight-hour workday. R. 502. PA-C Hicks wrote that Ms. Lanier was "likely to be absent from work as a result of the impairments of treatment . . . [m]ore than four days per month." R. 502. PA-C Hicks explained this opinion: "The patient is unable to stay focused for any given task as simple as asking/verbalizing/explaining her medical conditions. Her p[sy]chiatric medications cause her great distraction, inattention, and drowsiness." R. 502. PA-C Hicks provided these additional comments: "From a physical standpoint the patient has little limitations, from [a] psychiatric view she is unable to carry out simple tasks for employment. She is called multiple times for follow up appointments and consistently misses[] scheduled appointments, it would be fair to say she would not be consistent in showing up at work." R. 502. PA-C Hicks opined that Ms. Lanier had no ability to: "interact appropriately with the general public during an 8-hr. workday"; "get along with co-workers or peers during an 8-hr. workday"; "respond appropriately to supervision during an 8-hr. workday"; "make appropriate changes in the work setting"; or "respond to customary work pressures." R. 503. Finally, PA-C Hicks opined that Ms. Lanier's "mental health conditions preclude[d] her ability to maintain concentration, persistence[,] and pace for two-hour periods." R. 503.

The ALJ considered PA-C Hicks's medical opinion and discussed it in her

step three analysis, R. 15–16, as follows:

> In November of 2021, PA Hicks opined that [Ms. Lanier]
> cannot focus or pay attention sufficiently to perform even
> simple tasks for two hours at a time due to a combination
> of her mental impairments and medication side effects
> (Ex. 10F), but [Ms. Lanier] denied medication side effects
> (testimony). In addition, PA Hicks did not begin to treat
> [Ms. Lanier] until April of 2021, which is almost two years
> after the expiration of her insured status, and this provider
> consistently failed to document any deficits with attention
> or concentration in contemporaneous treatment notes (Ex.
> 6F).
>
> . . . .
>
> PA Hicks opined that [Ms. Lanier] cannot respond
> appropriately to normal work pressures, make appropriate
> changes in a work setting, or maintain regular work
> attendance (Ex. 10F); but she failed to document any
> deficits in [Ms. Lanier's] insight or judgment (Ex. 6F).

The ALJ also discussed PA-C Hicks's medical opinion in her residual

functional capacity findings, R. 21, as follows:

> This opinion is not persuasive because it is not supported
> by PA Hicks' examination findings of largely normal
> physical and mental status that were performed long after
> the date last insured (Ex. 6F). In addition, her opinion is
> inconsistent with the observations of earlier providers who
> regularly noted no physical abnormalities other than
> limited range of motion of the lumbar spine, and who
> regularly documented that [Ms. Lanier] was clean and well
> groomed, with clear, understandable speech in spite of
> anxiety and depression (Ex. 1F, 6F).

Ms. Lanier argues that the ALJ did not give sufficient rationale for rejecting the opinion of PA-C Hicks. Doc. 10 at 4–5. Specifically, Ms. Lanier argues that the ALJ's "brief evaluation" was improper under the regulations because "the ALJ failed to sufficiently articulate how she considered the critical factors of supportability and consistency . . . with respect to the opinions from treating P.A.-C. Hicks." *Id.* at 5, 8.

As an initial matter, the ALJ "considered th[is] medical opinion[] . . . in accordance with the requirements of 20 CFR 404.1520c." R. 17. Additionally, she stated: "As for medical opinion(s) . . . , the undersigned cannot defer or give any specific evidentiary weight, including controlling weight, to . . . medical opinion(s), including those from medical sources." R. 20. The ALJ articulated how persuasive she found the opinion, as required by the regulations. R. 21 ("This opinion is not persuasive . . . ."); *see* 20 C.F.R. § 404.1520c(b).

The ALJ applied the correct legal standards in evaluating PA-C Hicks's opinion, and substantial evidence supports her finding that it was "not persuasive because it is not supported by PA Hicks' examination findings" and "inconsistent with the observations of earlier providers." *See* R. 21. Before the ALJ made this finding with respect to PA-C Hicks's medical source statement, the ALJ detailed Ms. Lanier's history of anxiety and the treatment she received beginning at the alleged onset date of disability and continuing well-past her date of last insured. R.

18–19. In this section of her decision, the ALJ specifically referenced PA-C Hicks's

medical treatment notes from April and June of 2021:

> The claimant reported excessive fatigue from medications on
> 04/16/2021 and requested to reduce some of her pain
> medicines. Physician's assistant (PA) Dorothy Hicks
> commented that the claimant's mental impairments were
> stable currently and documented no psychological
> abnormalities. She noted that the claimant was receiving
> medication from Riverbend and stated that she would start
> tapering the claimant's clonazepam at the next office visit
> (Ex. 6F at p. 46). On 06/18/2021, the claimant noted clearer
> thinking since adding Lyrica and tapering tramadol. PA Hicks
> again documented no psychological abnormalities (Ex. 6F at
> p. 51).

R. 18–19.

Under the new regulations, the ALJ adequately accounted for her finding

regarding PA-C Hicks's medical opinion. The ALJ's decision reflects that she

considered PA-C Hicks's own examination findings in her analysis. R. 21. The ALJ

expressly considered PA-C Hicks's examination findings from almost two years

after the date of last insured as well as the entirety of her medical opinion. R. 18–19,

21. Additionally, the ALJ cited other medical evidence in the record that was

inconsistent with PA-C Hicks's medical opinion. *See* R. 18–19.

The ALJ applied the correct legal standards in evaluating PA-C Hicks's

opinion, and substantial evidence supports her finding that it was inconsistent with

her own treatment records and the medical records as a whole. Ms. Lanier has not

shown that the ALJ erred in her consideration of the medical opinion evidence.

**B. The ALJ's Evaluation Under the Pain Standard**

A claimant's subjective complaints are insufficient to establish a disability. *See* 20 C.F.R. § 404.1529(a); *Edwards v. Sullivan*, 937 F.2d 580, 584 (11th Cir. 1991). Subjective testimony of pain and other symptoms may establish the presence of a disabling impairment if it is supported by medical evidence. *See Foote v. Chater*, 67 F.3d 1553, 1561 (11th Cir. 1995). The Eleventh Circuit applies a two-part pain standard when a claimant claims disability due to pain or other subjective symptoms. The claimant must show evidence of an underlying medical condition and either (1) objective medical evidence that confirms the severity of the alleged symptoms arising from the condition, or (2) that the objectively determined medical condition is of such severity that it can reasonably be expected to give rise to the alleged symptoms. *See* 20 C.F.R. § 404.1529(a), (b); Social Security Ruling 16-3p, 2017 WL 5180304, at *3–*4 (Oct. 25, 2017) ("SSR 16-3p"); *Wilson v. Barnhart*, 284 F.3d 1219, 1225 (11th Cir. 2002).

If the first part of the pain standard is satisfied, the ALJ then evaluates the intensity and persistence of a claimant's alleged symptoms and their effect on her ability to work. *See* 20 C.F.R. § 404.1529(c); *Wilson*, 284 F.3d at 1225–26. In evaluating the extent to which a claimant's symptoms affect her capacity to perform basic work activities, the ALJ will consider (1) objective medical evidence, (2) the nature of a claimant's symptoms, (3) the claimant's daily activities, (4) precipitating

and aggravating factors, (5) the effectiveness of medication, (6) treatment sought for relief of symptoms, (7) any measures the claimant takes to relieve symptoms, and (8) any conflicts between a claimant's statements and the rest of the evidence. *See* 20 C.F.R. § 404.1529(c)(3), (4); SSR 16-3p at *4, *7–*8. To discredit a claimant's statements, the ALJ must clearly "articulate explicit and adequate reasons." *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

An ALJ's review "must take into account and evaluate the record as a whole." *McCruter v. Bowen*, 791 F.2d 1544, 1548 (11th Cir. 1986). There is no rigid requirement that the ALJ specifically refer to every piece of evidence in her decision. *Jacobus v. Comm'r of Soc. Sec.*, 664 F. App'x 774, 776 (11th Cir. 2016). Instead, the ALJ must consider the medical evidence as a whole and not broadly reject the evidence in the record. *Id.*

A determination under the pain standard is a question of fact subject only to limited review in the courts to ensure the finding is supported by substantial evidence. *See Hand v. Heckler*, 761 F.2d 1545, 1548–49 (11th Cir. 1985), *vacated for rehearing en banc*, 774 F.2d 428 (11th Cir. 1985), *reinstated sub nom., Hand v. Bowen*, 793 F.2d 275 (11th Cir. 1986). The Eleventh Circuit will not disturb a clearly articulated finding supported by substantial evidence. *Mitchell v. Comm'r, Soc. Sec. Admin.*, 771 F.3d 780, 782 (11th Cir. 2014). However, a reversal is warranted if the decision contains no indication of the proper application of the pain standard. *See*

*Ortega v. Chater*, 933 F. Supp. 1071, 1076 (S.D. Fla. 1996) (holding that the ALJ's failure to articulate adequate reasons for only partially crediting the plaintiff's complaints of pain resulted in reversal). "The question is not . . . whether [the] ALJ could have reasonably credited [claimant's] testimony, but whether the ALJ was clearly wrong to discredit it." *Werner v. Comm'r of Soc. Sec.*, 421 F. App'x 935, 939 (11th Cir. 2011).

Ms. Lanier argues that "[t]he ALJ's meager evaluation of Ms. Lanier's subjective statements is not supported by substantial evidence." Doc. 10 at 10. Specifically, Ms. Lanier argues that "[w]ith respect to Ms. Lanier's mental impairments, she simply noted that Plaintiff was described in treatment records as clean and well groomed with normal cognition and speech but abnormal mood/affect (Tr. 20)." *Id.*

It is clear the ALJ applied the Eleventh Circuit's pain standard. After explaining the pain standard, with citations to 20 C.F.R. § 404.1529 and SSR 16-3p, the ALJ considered Ms. Lanier's testimony about her symptoms. *See* R. 17–18. The ALJ described Ms. Lanier's adult function report and testimony in her decision:

> The claimant submitted an adult function report on 05/27/2020 and alleged that she spent most of her time in her room watching television and playing games on her telephone. She reported trouble sleeping and said that she did not bathe or change her clothes regularly. She said that she needed reminders to go to appointments and to pay bills but not to take her medication. The claimant reported that she could do laundry but did not perform any other

27

household chores. She stated that she could drive and shop, but people made her nervous. She alleged no social activities other than with members of her immediate household but said that her sister and brother visited occasionally. She stated that she could not follow instructions well, but she had no difficulty paying attention. The claimant reported that authority figures made her nervous, and she did not react well to stress or changes in her routine (Ex. 6E). . . .

The claimant testified that she has pain in her middle and lower back that limits her to standing no more than an hour and that prolonged walking makes her dizzy. She said that she cannot sit but must lie in bed all day. She alleged that anxiety and panic attacks are her biggest problem, especially in crowds. She stated that she cannot handle pressure and is unable to concentrate, focus or remember things. She reported that she must be accompanied when she leaves her home.

R. 17–18.

"After careful consideration of the evidence," the ALJ found "that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms." R. 18; *see* R. 18–19 (chronological discussion of medical evidence). The ALJ then found that Ms. Lanier's "statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record." R. 18. The ALJ stated that "[a]s for the claimant's mental impairments, prior to the date last insured, she regularly was described as clean and well groomed with normal

cognition and speech in spite of occasionally anxious or depressed mood and affect

(Ex. 1F, 6F, 8F)." R. 20. The ALJ concluded that the residual functional capacity is:

> supported by evidence that, during the relevant period, the claimant consistently exhibited normal grooming, hygiene, speech, and cognition in spite of anxious or depressed mood and affect (Ex. 1F, 6F, 8F). In addition, the medical evidence does not indicate exacerbations of psychiatric symptoms which are disabling for twelve consecutive months but rather an unstable home environment resulting in the intervention of the Department of Human Resource[s] . . . , but not prior to the expiration of her insured status." R. 21–22. The ALJ also noted that the medical records do not reflect "psychiatric hospitalizations" or "intensive treatment plans or programs.

R. 22.

The ALJ's evaluation of Ms. Lanier's symptoms was not "meager." Instead, after discussing the medical evidence, the ALJ summarized those findings related to Ms. Lanier's mental impairments during the relevant period. As discussed in Section III, *supra*, those records refer to clear speech and Ms. Lanier being alert and oriented. *See, e.g.*, R. 345. The ALJ cannot be faulted for using the language included in the medical evidence. The medical evidence cited by the ALJ – generally unremarkable findings, no hospitalizations or ongoing mental health treatment during the relevant period, and conservative management with medications – supports the ALJ's finding that Ms. Lanier's allegations of disabling limitations were not fully consistent with the evidence. *See, e.g.*, R. 285, 291, 346, 350–51, 353–54, 358–59, 362, 365, 368,

371 (reflecting conservative care with medication and routine follow-up appointments); R. 281, 287, 293, 352, 357, 363, 369 (reflecting that Ms. Lanier's anxiety was usually controlled by medication). And, the ALJ accounted for Ms. Lanier's subjective complaints when she determined Ms. Lanier was limited to medium work with additional, nonexertional limitations. R. 16–17. Accordingly, there is no error in the ALJ's consideration of Ms. Lanier's subjective complaints.

### C. The ALJ's Narrative Discussion of Residual Functional Capacity

Social Security Ruling 96-8p ("SSR 96-8p") regulates the ALJ's assessment of a claimant's residual functional capacity. Under SSR 96-8p, the residual functional capacity "assessment must first identify the individual's functional limitations or restrictions and asses his or her work-related abilities on a function-by-function basis." SSR 96-8p at *1, 1996 WL 374184 (July 2, 1996). The ruling specifically mandates a narrative discussion of "the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis . . . and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case record." *Id.* at *7. Additionally, in cases where symptoms are alleged, the assessment of a claimant's residual functional capacity must: "Contain a thorough discussion and analysis of the objective medical and other evidence . . . ; Include a resolution of any

inconsistencies in the evidence as a whole; and Set forth a logical explanation of the effects of the symptoms . . . on the individual's ability to work." *Id.*

The Eleventh Circuit has held that, even when the ALJ could have been "more specific and explicit" in her findings with respect to a claimant's "functional limitations and work-related abilities on a function-by-function basis," those findings nonetheless satisfy the requirements of SSR 96-8p if the ALJ considered all of the evidence. *Freeman v. Barnhart*, 220 F. App'x 957, 959–60 (11th Cir. 2007); *see also Castel v. Comm'r of Soc. Sec.*, 355 F. App'x 260, 263 (11th Cir. 2009) (holding that an ALJ's finding is sufficiently detailed despite lacking an express discussion of every function if there is substantial evidence supporting the ALJ's residual functional capacity assessment). In addition, the ALJ is not required to "specifically refer to every piece of evidence in [her] decision," so long as the decision is sufficient to allow the court to conclude that the ALJ considered the claimant's medical condition as a whole. *Dyer*, 395 F.3d at 1211.

An individual claiming benefits must prove that she is disabled. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). The burden is on the claimant to introduce evidence in support of her application for benefits. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). The Commissioner is not required to hire an expert medical source when determining whether a claimant is disabled. 20 C.F.R. §§ 404.1513a(b)(2), 404.1517; *Klawinski v. Comm'r of Soc. Sec.*, 391 F. App'x 772,

776 (11th Cir. 2010); *Wilson v. Apfel*, 179 F.3d 1276, 1278 (11th Cir. 1999) (recognizing that the ALJ is not "obligated to seek independent, additional expert medical testimony" when the record is sufficient to support the ALJ's decision). Instead, "the ALJ has a basic obligation to develop a full and fair record." *Graham v. Apfel*, 129 F.3d 1420, 1422 (11th Cir. 1997). "The court should be guided by whether the record reveals evidentiary gaps which result in unfairness or 'clear prejudice.'" *Id.* at 1423.

Ms. Lanier makes multiple arguments regarding the ALJ's residual functional capacity. *First*, Ms. Lanier argues that in formulating her mental functioning residual functional capacity, the ALJ rejected the medical opinion from PA-C Hicks and "opinions . . . from the non-examining state agency medical consultants." Doc. 10 at 11. *Second*, Ms. Lanier argues that "[t]he ALJ here failed to cite to any *specific* medical facts or even persuasive non-medical evidence in the record that supports her mental [residual functional capacity] determination for Ms. Lanier." *Id.* at 12. *Third*, Ms. Lanier argues that "[t]he ALJ failed to obtain" "an examination by a mental health specialist." *Id.* at 13.

During step three in the sequential evaluation, the ALJ specifically noted that her assessment of Ms. Lanier's residual functional capacity reflected the limitations she found in another part of her analysis – namely, her analysis of whether the severity of Ms. Lanier's mental impairments, considered singly and in combination,

meet or medically equal the criteria set forth in paragraph B of 20 C.F.R. § 404,

Subpart P, Appendix 1 ("the 'paragraph B' analysis"). 20 C.F.R. Part 404, Subpt. P,

App. 1 (Listings) § 12.00A.2.b; 20 C.F.R. § 404.1520(d). In the "paragraph B"

analysis, the ALJ determined that Ms. Lanier's mental impairment was not

medically equivalent to any impairment listed in the applicable regulations (20

C.F.R. §§ 404.1520(d), 404.1525, and 404.1526). R. 13. As the ALJ explained:

> The limitations identified in the "paragraph B" criteria are
> not a residual functional capacity assessment but are used
> to rate the severity of mental impairments at steps 2 and 3
> of the sequential evaluation process. The mental residual
> functional capacity assessment used at steps 4 and 5 of the
> sequential evaluation process requires a more detailed
> assessment . . . . The following residual functional capacity
> assessment reflects the degree of limitation the
> undersigned has found in the "paragraph B" mental
> function analysis.

R. 16. In the paragraph B analysis, the ALJ found a moderate limitation in interacting

with others; concentrating, persisting, or maintaining pace; and adapting or

managing oneself. R. 15–16. In making these findings, the ALJ cited Ms. Lanier's

testimony, an adult function report completed by Ms. Lanier, an adult function report

completed by her fiancé, PA-C Hicks's medical opinion, and medical records. R.

15–16. With respect to interacting with others, the ALJ stated: "Based on the

total[it]y of the evidence and her mental status exams when she is compl[ia]nt with

her medication regimen, the undersigned is persuaded the claimant could have

tolerated occasional interactions with supervisors and coworkers but in order to

avoid exacerbations, she should have had no interaction with the general public." R. 15. With respect to concentrating, persisting, or maintaining pace, the ALJ stated: "During the relevant period, therefore, the claimant was able to perform simple, routine tasks requiring no more than one- to three-step instructions." R. 16. With respect to adapting or managing oneself, the ALJ stated: "Accordingly, the claimant is determined to have the abilities to make simple work-related decisions and to respond appropriately to infrequent, well-explained workplace changes." R. 16.

These findings reflect that the ALJ carefully considered the evidence of Ms. Lanier's alleged mental impairments in determining her residual functional capacity. The ALJ then went on to identify three specific conditions reflecting Ms. Lanier's nonexertional limitations. The ALJ's residual functional capacity includes:

> She could have performed simple, routine tasks requiring no more than simple one- to three-step instructions and simple, work-related decision making. She could have tolerated occasional interactions with co-workers and supervisors but no interactions with members of the general public. The claimant could have adapted and responded appropriately to infrequent, well-explained changes in the workplace.

R. 17.

Further, the ALJ explained that she considered "all symptoms and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" and opinion evidence. R. 17. The ALJ properly applied the Eleventh Circuit's pain standard as discussed *supra* in Section

IV.B., and the ALJ also discussed the weight given to the medical opinion of PA-C Hicks as discussed *supra* in Section IV.A. R. 17–21.

With respect to state agency medical opinions, although Ms. Lanier seems to argue that the ALJ was incorrect to reject those opinions in her formation of the residual functional capacity, the ALJ in fact considered these opinions and included limitations even though the state agency determinations found insufficient evidence to do so. R. 21, 74–88. The ALJ stated:

> State agency psychiatric consultant Lee Blackmon M.D. reviewed the available evidence on June 19, 2020 and found insufficient evidence to rate the severity of the claimant's mental impairments (Ex. 1A). Upon a request for reconsideration, state agency psychiatric consultant Robert Estock M.D. reviewed the evidence on 08/05/2020 and agreed that there was insufficient evidence to rate the severity of the claimant's mental impairments (Ex. 3A). Based upon the totality of the evidence of record, the undersigned finds that the evidence supports the following limitations in her mental abilities prior to the expiration of her insured status.

R. 14. While the state agency consultants stated they had insufficient evidence to opine on the Paragraph B categories, the ALJ found moderate limitations and crafted nonexertional limitations in Ms. Lanier's residual functional capacity to correspond to these findings.

The court rejects Ms. Lanier's argument that "[t]he ALJ here failed to cite to any *specific* medical facts or even persuasive non-medical evidence in the record that supports her mental [residual functional capacity] determination for Ms.

Lanier." *See* Doc. 10 at 12. As discussed *supra* in Section V.B, when applying the Eleventh Circuit's pain standard, the ALJ cited to specific evidence in the medical record from the relevant period and in the years following Ms. Lanier's date of last insured. *See* R. 18–19 (discussing medical records beginning October 8, 2015 and continuing through September 21, 2021). Additionally, in each of the paragraph B criteria, the ALJ discussed specific medical evidence related to the category. R. 15–16. For example, when discussing interaction with others, the ALJ noted:

> There is no evidence of bizarre behaviors or inappropriate or hostile interactions when seen by medical professionals for treatment. The claimant has not been hospitalized for a mental disorder and she has not required ongoing mental health treatment by a mental health counselor during the alleged period. Although she has reported self isolation, there is no evidence she is unable to interact with others, but rather she prefers to limit her interactions due to life style choices.

R. 15. It is not the court's role to re-weigh the evidence or substitute its judgment for that of the Commissioner. Here, the ALJ thoroughly discussed and cited medical evidence throughout her step three and four determinations.

Although Ms. Lanier argues that there is a lack of an examination by a mental health specialist, the ALJ discussed Ms. Lanier's self-reported mental impairments and cited corresponding medical records. R. 18–19. And the ALJ included a detailed discussion in her step three analysis. R. 14–16. Also, the ALJ specifically included mental functional limitations in Ms. Lanier's residual functional capacity. R. 16–17.

For example, the residual functional capacity limited Ms. Lanier to work that included: "simple, routine tasks"; "simple one- to three-step instructions"; "simple, work-related decision making"; "occasional interactions with co-workers and supervisors"; "no interactions with members of the general public"; and "infrequent, well-explained changes in the workplace." R. 17. Therefore, the record here was neither incomplete nor inadequate as it related to Ms. Lanier's cognitive and mental deficits. Instead, the record was sufficient for the ALJ to evaluate Ms. Lanier's impairments and craft a residual functional capacity that incorporated her abilities. Substantial evidence supports the ALJ's consideration of Ms. Lanier's impairments, and Ms. Lanier has failed to establish that the ALJ had any obligation to further develop the record.

The conditions in the residual functional capacity were well-explained and well-supported by medical evidence. Therefore, the court concludes that that ALJ complied with the requirements of SSR 96-8p.

### D. The ALJ's Hypothetical Question to the Vocational Expert

"In order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments." *Wilson v. Barnhart*, 284 F.3d 1219, 1227 (11th Cir. 2002). The hypothetical question posed by the ALJ need not include impairments that the

ALJ has properly determined to be unsupported by the evidentiary record. *Crawford v. Comm'r*, 363 F.3d 1155, 1161 (11th Cir. 2004).

In *Winschel v. Commissioner*, the Eleventh Circuit found error in an ALJ's decision because the ALJ determined the claimant had "a moderate limitation in maintaining concentration, persistence, and pace" but "did not indicate that medical evidence suggested [the claimant's] ability to work was unaffected by this limitation, nor did he otherwise implicitly account for the limitation in the hypothetical [to the VE]." 631 F.3d 1176, 1181 (11th Cir. 2011). According to the Eleventh Circuit, "the ALJ should have explicitly included the limitation in his hypothetical question to the [VE]." *Id.* Nevertheless, the Eleventh Circuit suggested that in other appropriate circumstances, an ALJ may properly find that the medical evidence of record supports only an RFC limitation of unskilled work despite moderate limitations in concentration, persistence, or pace. *See id.* (collecting cases finding that "when medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite limitations in concentration, persistence, and pace, courts have concluded that limiting the hypothetical to include only unskilled work sufficiently accounts for such limitations").

Post-*Winschel*, the Eleventh Circuit (albeit in unpublished opinions) has recognized that a moderate limitation in concentration, persistence and pace can be sufficiently accounted for by posing a hypothetical to a VE that limits an individual

to simple, unskilled work (or something similar) when the medical evidence demonstrates an ability to perform such work. *See, e.g., Mijenes v. Comm'r*, 687 F. App'x 842, 846 (11th Cir. 2017) (finding that "[b]ecause the medical evidence showed that [the claimant] could perform simple, routine tasks despite her limitations in concentration, persistence, and pace, the ALJ's limiting of [the claimant's RFC] to unskilled work sufficiently accounted for her moderate difficulties in concentration, persistence, and pace"); *Jacobs v. Comm'r*, 520 F. App'x 948, 951 (11th Cir. 2013) (finding a limitation "to one to three step non-complex tasks" sufficiently accounted for moderate limitation in concentration, persistence, and pace); *Washington v. Soc. Sec. Admin., Comm'r*, 503 F. App'x 881, 883 (11th Cir. 2013) (finding a limitation "to performing only simple, routine repetitive tasks with up to three-step demands, and only occasional changes in the work setting, judgment, or decision making" was sufficient to account for moderate limitation in maintaining concentration, persistence, and pace); *Scott v. Comm'r*, 495 F. App'x 27, 29 (11th Cir. 2012) (distinguishing *Winschel* and finding that "the medical evidence demonstrated that [the claimant] could engage in simple, routine tasks or unskilled work despite moderate limitations in concentration, persistence, and pace").

After considering the "entire record," the ALJ found that Ms. Lanier has:

> the residual functional capacity to perform medium work
> as defined in 20 CFR 404.1567(c) except that she

> occasionally could lift and/or carry up to fifty pounds and
> frequently could lift and/or carry up to twenty-five pounds.
> She could stand and/or walk in combination, with normal
> breaks, for six to eight hours during an eight-hour
> workday; and she could sit, with normal breaks, for six to
> eight hours during an eight-hour workday. The claimant
> frequently could climb ramps and stairs and occasionally
> could climb ladders, ropes or scaffolds. She frequently
> could balance, stoop, kneel, crouch, and crawl. She could
> tolerate occasional (as the term "occasional" is defined in
> the DOT) exposure to extreme heat, humidity and working
> in areas of vibration; but she should have avoided
> exposure to industrial hazards including working at
> unprotected heights, working in close proximity to moving
> dangerous machinery, and operating motorized vehicles
> and equipment. She could have performed simple, routine
> tasks requiring no more than simple one- to three-step
> instructions and simple, work-related decision making.
> She could have tolerated occasional interactions with co-
> workers and supervisors but no interactions with members
> of the general public. The claimant could have adapted and
> responded appropriately to infrequent, well-explained
> changes in the workplace.

R. 16–17. At the administrative hearing, the ALJ posed a series of hypotheticals to

the vocational expert. R. 68–71. This series of questions included hypothetical

number one, which incorporated the residual functional capacity as determined by

the ALJ after her review of the record:

> Q: For purpose of hypothetical #1, I am going to ask you
> to assume a hypothetical individual the same age,
> education, and work experience, Mr. Boaz, as we had just
> determined. I am going to ask you to further assume that
> such a hypothetical individual could occasionally lift
> and/or carry up to 50 pounds and frequently lift and/or
> carry up to 25. She could stand and/or walk in combination
> with normal breaks for six to eight hours during an eight-

hour workday. And she can sit with normal breaks for six to eight hours during an eight-hour workday. She could frequently climb ramps and stairs and occasionally climb ladders, ropes, or scaffolds. She can frequently balance, stoop, kneel, crouch and crawl. She can tolerate occasional exposure to extreme heat, humidity, and working in areas of vibration. She should avoid exposure to industrial hazards including working at unprotected heights; working in close proximity to moving, dangerous machinery; and the operation of motorized vehicles and equipment; and perform simple, routine tasks requiring no more than simple one- to three-step instructions and simple, work-related decision making. She could have occasional interactions with coworkers and supervisors and no interactions with members of the general public. She could adapt and respond appropriately to infrequent, well-explained changes in the workplace. Given those functional limitations, could such a hypothetical individual perform any of her previous work as it was actually or customarily performed?

A: Well, the past work was that of light exertion, occasional 50 and frequent 25 indicating a medium exertion. But the convenience store clerk would be working with the public. And this job would probably have more than just frequent, routine changes, so could not perform past work.

. . . .

Q: Would there be other unskilled, entry-level jobs?

A: There would be. One example would be a cleaner II in automotive . . . . Another example would be a bundle clerk. . . . And then finally, a factory helper.

R. 68–70.

41

Here, the ALJ found that although Ms. Lanier had "moderate limitation[s]" in "concentrating, persisting[,] or maintaining pace," she was still "able to perform simple, routine tasks requiring no more than one- to three-step instructions." R. 15–16. In support, the ALJ observed that PA-C Hicks "consistently failed to document any deficits with attention or concentration in contemporaneous treatment notes," "earlier primary care providers documented no concentration or attention deficits until [October 2, 2019], when CRNP Russell noted rambling speech," and Ms. Lanier was "alert and oriented with clear, understandable speech in spite of symptoms of anxiety and depression." R. 15.

Substantial evidence supports the ALJ's determination that Ms. Lanier could handle "simple, routine tasks requiring no more than one- to three-step instructions" despite her moderate limitations in concentrating, persisting, or maintaining pace. *See* R. 16; *see, e.g.*, R. 283, 289, 295, 303, 309, 345, 350, 353, 358, 362, 364, 367, 370 (reflecting unremarkable findings during physical neurologic exams); R. 345, 348, 350, 353, 356, 358 (reflecting Ms. Lanier was alert and oriented, with appropriate mood and affect). The ALJ properly accounted for Ms. Lanier's moderate limitations in concentration, persistence, and pace by incorporating the nonexertional mental limitations in the residual functional capacity.

The ALJ included all of the limitations in Ms. Lanier's residual functional capacity in the first hypothetical she posed to the vocational expert. Therefore, the

vocational expert's testimony was based on a proper statement by the ALJ and constitutes substantial evidence supporting the ALJ's decision.

## VI.    Conclusion

The ALJ's determination that Ms. Lanier is not disabled is supported by substantial evidence. The Commissioner's final decision is therefore affirmed. A separate order will be entered.

**DONE** and **ORDERED** this 27th day of September, 2023.

**ANNA M. MANASCO**
UNITED STATES DISTRICT JUDGE